United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RICHARD KENNETH BURNHAM,<br><br>Plaintiff,<br><br>v.<br><br>NANCY A. BERRYHILL,<br><br>Defendant. | Case No. 17-cv-05476-JCS<br><br>**ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT, DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT, REVERSING DECISION OF THE COMMISSIONER AND REMANDING FOR AWARD OF BENEFITS**<br><br>Re: Dkt. Nos. 18, 20 |

## I.      INTRODUCTION

Plaintiff Richard Kenneth Burnham seeks review of the final decision of Defendant Nancy A. Berryhill, Acting Commissioner of Social Security (the "Commissioner"), denying Burnham's application for disability insurance benefits ("DIB") and supplemental security income ("SSI") and under Titles II and XVI of the Social Security Act ("SSA").  Presently before the Court are the parties' motions for summary judgment.  For the reasons discussed below, Burnham's Motion for Summary Judgment is GRANTED, the Commissioner's Motion for Summary Judgment is DENIED, the decision of the Commissioner is REVERSED and the matter is REMANDED to the Commissioner for calculation and award of benefits.[1]

## II.      BACKGROUND

### A.      Procedural Background

Burnham applied for disability benefits on May 13, 2014, submitting applications for both DIB and SSI, alleging an onset date of January 1, 2013 in both applications.  Administrative

---

[1] The parties have consented to the jurisdiction of the undersigned magistrate judge for all purposes pursuant to 28 U.S.C. § 636(c).

Record ("AR") 228 (DIB), 235 (SSI), 252 (Disability Report – Field Office).[2]  Both claims were

initially denied on December 8, 2014 and upon reconsideration on March 24, 2015.   AR 114, 144.

Burnham filed a timely written request for a hearing, AR 174, which was held on August 3, 2016,

in San Rafael, California.  AR 37.  At the hearing, Burnham was represented by his attorney,

Brian Barboza, who also represents him in this action.  *Id*.  Vocational expert ("VE") Bonnie

Drumwright also testified at the hearing.   Administrative Law Judge ("ALJ") Suzanne

Krolikowski presided over the hearing.  *Id*.  The ALJ issued her written decision denying

Burnham's applications on September 29, 2016.  AR 16-29.  On October 31, 2016, Burnham

submitted a Request for Review of the Hearing Decision to the Appeals Council.  AR 225.   On

July 28, 2017, the Appeals Council denied Burnham's Request for Review, making the ALJ's

decision the final decision of the Commissioner.  AR 1-6.  On September 21, 2017, Burnham

timely filed the instant action.

## B.    Burnham's Background

Burnham was born on April 27, 1985.  AR 252.  He dropped out of high school during his

junior year but received his GED (a certificate of high school equivalency) in 2007.  AR 257, 932.

He has not attended college or received any specialized vocational training.  *Id*.  Since 2007,

Burnham has had one job, working under his uncle at a television and radio station.  AR 47, 257.

At the time of the hearing Burnham was working no more than two days a week for two to three

hours in a day.  AR 49;  *see also*  AR 249 (reflecting that Burnham earned $1,472 in 2012, $2,248

in 2013, $1,036 in 2014 and nothing in 2015).

Burnham has suffered from gouty arthritis[3] since about age 16, as well as "long-standing

---

[2] The administrative record reflects that the applications were actually filed on June 26, 2014.  AR
228, 235.   However, the Field Office Disability Report reflects a protective application date of
May 13, 2014.  "Protective filing is a Social Security term for the first time you contact the Social
Security Administration to file a claim for disability or retirement. Protective filing dates may
allow an individual to have an earlier application date than the actual signed application date. This
is important because protective filing often affects the entitlement date for disability and
retirement beneficiaries along with their dependents." *Zerby v. Comm'r of Soc. Sec. Admin*., No.
1:13CV1405, 2014 WL 3956778, at *1 (N.D. Ohio Aug. 13, 2014) (citing http://www.ssdrc.com
/disabilityquestionsmain20.html).
[3] The record reflects that in 2011, doctors at UCSF concluded that Burnham had been suffering for
approximately ten years from gouty arthritis, replacing the previous diagnosis of "symmetric
polyarthritis."  AR 364.  From that point on, Burnham's medical records consistently reflect his

2

hyperuricemia with frequent uric stones." AR 913. He has also been diagnosed with "severe osteopenia," hearing loss, obesity, spinal disorder, anxiety and depression, among other things. AR 913, 1027. With the exceptions of the consultative examiners, summarized below, the Court addresses the specific medical evidence in the record in its analysis.

## C. Consultative Examiner Medical Opinions

On November 4, 2014, psychological consultative examiner Dr. Janine Marinos, PhD diagnosed Burnham with social phobia and dysthymic disorder. *Id.* at 880. She noted that he "related a history of social anxiety and depression" and that although he had been in therapy and on medication in the past he was "uncomfortable talking to a counselor and had no appreciable benefit from medication." AR 881. Dr. Marinos observed that Burnham appeared "able to understand and carry out simply job instructions, but may have mild/moderate difficulty interacting effectively with others and moderate difficulty maintaining concentration over the course of a normal work day and coping with stress in a job setting." *Id.* She opined that should Burnham be awarded benefits, "he appears able to handle his funds in his own best interests." *Id.* Dr. Marinos gave Burnham a Global Assessment of Function ("GAF")[4] score of 60, noting that her impression was of limited scope because it was based on a "single, time-limited session of client contact." *Id.* at 880. Dr. Marinos noted that Burnham "ambulated with a cane." *Id.*

---

diagnosis as "acute gouty arthropathy" or "gouty arthritis." *See, e.g.,* AR 929, 937941, 945, 949, 953, 957, 961, 965, 969,975, 978,981, 987,1009, 1019, 1034, 10401052. Frequently, Burnham's medical providers referred to his gouty arthritis simply as "gout." There is no evidence in the Administrative Record that Burnham has ever been diagnosed with "arthritis" as a separate impairment from his gout, although ALJ Kolokowski treated them as such in her written decision. *See* AR 19 (listing gout and arthritis as separate impairments). The hearing transcript similarly reflects that ALJ Krolikowski, relying on her own knowledge rather than any medical records, concluded that Burnham had two separate impairments – gout and arthritis – and that Burnham was taking medication only for his gout and not for his arthritis. *See* AR 65 (ALJ: "those do look like gout medications from what I know" (referring to Colchine and Allopurinol) . . . "nothing is listed for arthritis at all").

[4]GAF is a scale reflecting "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." Diagnostic and Statistical Manual of Mental Disorders 34 (4th ed. 2000). A score of 21-30 indicates that behavior is considerably influenced by delusions or hallucinations, serious impairment in communication or judgment, or inability to function in almost all areas; a score of 31-40 signifies some impairment in reality testing or communication, or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood; a score of 41-50 is given for serious symptoms; a score of 51-60 means moderate symptoms; and a score of 61-70 signifies mild symptoms.

On November 14, 2014, consultative examiner Christina Sitenga-Kako, MD, who is certified in internal medicine, conducted an internal medicine evaluation of Burnham. AR 884. She did not review any of Burnham's medical records and had not been provided with any of his records. *Id.* Dr. Sitenga-Kako stated that Burnham "last worked last evening, wherein he filmed a committee meeting for city council." AR 885. She went on to state that Burnham "typically works a couple of hours at a time where most of his time is spent standing, holding a camera." *Id.* Based on her examination, Dr. Sitenga-Kako found that Burnham had the following impairments: (1) gout; (2) morbid obesity; (3) hypertension; (4) anxiety; and (5) low back pain. AR 884-888. She concluded that Burnham had no limitations in standing, walking capacity, sitting capacity, manipulative activities, or workplace environmental activities. *Id.* at 888. With respect to postural activities, Dr. Sitenga-Kako found that Burnham had no limitations in climbing stairs, stooping, crouching, kneeling, and crawling, and could climb ladders, scaffolding, and ropes frequently. *Id.* Furthermore, she opined that Burnham could lift, carry, push, and pull "50 pounds occasionally, and 25 pounds frequently, secondary to chronic low back pain." *Id.* Dr. Sitenga-Kako stated that Burnham ambulated without an assistive device. AR 884.

Consultative examiner S. Hanna, MD, performed a review of the record and found that Burnham could stand, walk, and/or sit for a total of about six hours in an eight-hour workday, with the postural limitations of frequently climbing ramps or stairs, or balancing, and occasionally climbing ladders, ropes, or scaffolds, or crawling. *Id.* at 92–93, 108–09.

Consultative examiner Heather Barrons, a psychologist, also reviewed Burnham's medical records and concluded on December 8, 2014 that Burnham was not significantly limited in most mental residual functional capacities but was moderately limited in his ability to maintain attention and concentration for extended periods, in his need for rest periods, and in his ability to interact appropriately with the general public. *Id.* at 94–95, 110–11. Barrons stated that Burnham would "benefit from limited public contact due to anxiety." AR 95.

S. Amon, MD, conducted a record review on March 9, 2015 and reached substantially the same conclusions as Dr. Hanna as to Burnham's physical impairments of gout, obesity, essential hypertension and spine disorders. *Id.* at 123–27, 138–41. Likewise, consulting physician M.

Friedland, PhD, conducted a record review on March 20, 2015 and mostly adopted the initial mental assessment of Dr. Barrons but clarified that Burnham was "limited to simple one and two-step mental tasks in a work-like setting involving limited contact with co-workers and the general public only due to psychological based symptoms." *Id.* at 124, 137.

### D. Administrative Hearing

At the administrative hearing, Burnham testified that he lives with his mother and one of his brothers and does not have a driver's license because he feels too uncomfortable in cars. AR 46. He testified that he had been in special education for learning issues and that he finished his GED. AR 47. He also described his job, testifying that he works at a local radio and TV station where he is involved in broadcasting meetings and sports. AR 47–48. Burnham testified that he used to operate the camera and be on the set-up crew, but that he had not been able to work on the set-up crew for years and now rarely operated the camera. AR 48. The ALJ asked Burnham, "how much did the camera weigh that you used to carry" and Burnham responded, "it is mounted on a tripod most of the time." *Id.* He testified that he sometimes works on production, which involves sitting at a computer and deciding which camera to switch to. AR 49. He stated that he works "usually no more than two or three hours a day, and a couple of times a week at most," earning about $200 a month. *Id.*

In response to a question from the ALJ, Burnham testified that he did not think that he could do the production work—where he is in a sitting position—for 40 hours a week. *Id.* Burnham explained that he has trouble sitting for long periods, due to back, knee, sciatica, and tailbone pain, as well as "very bad anxiety issues." *Id.* Burnham also testified that he experiences gout flare-ups every couple of months, requiring medication, and that the flare-ups calm down within a few days with the medication. *Id.* at 51. Burnham testified that he takes Tylenol for pain. *Id.* He testified that he had a prescription for Vicodin but did not take it because it made him nauseous and he worried about becoming addicted. *Id.* at 51–52. Burnham testified that he takes Benazepril and Metoprolol for high blood pressure and Zoloft and Trazadone for anxiety and sleep problems. AR 52, 54. Addressing his anxiety, the ALJ asked Burnham if he would be more comfortable in a job environment of only a few coworkers. *Id.* at 52–53. Burnham responded

"I'm not sure, it would depend. Doing the tasks is really stressful for me too." *Id.* at 53.

The ALJ questioned Burnham about his therapy and in particular, whether a particular gap in therapy that she understood had lasted five to six months was because Burnham had significantly improved. AR 55-56. Instead, Burnham testified that there were gaps because he has "spurts" where he has "a lot of trouble seeing doctors." AR 56. When the ALJ asked again about the same gap and whether it was because he had "really improved," Burnham testified that he knew the period she was likely referring to and that the gap was because the clinic wasn't very good at scheduling and he was not good at "keeping up with those sorts of things." AR 56. Burnham also testified that there had been a gap because his therapist, Dr. Flett, had left the clinic and that he was trying to find a new therapist. *Id.* at 55.

Burnham testified that one of his favorite activities is playing video games, and that he spends four to five hours a day playing. AR 57-58. The ALJ asked if Burnham played video games with other people or if he had "online friends," referring to a treatment note by his therapist. AR 58. Burnham answered that he played solo and did not have "gamer friends" and that his therapist was likely referring to his participation in a YouTube group in which he had participated "for while" but that was now defunct. AR 57. Burnham testified that he sits on his bed or a recliner while he plays but that every 15 to 30 minutes he needs to take a break and stand for approximately five minutes. *Id.* at 58.

Burnham confirmed that he can do light housekeeping, laundry, shopping, and simple meal preparation, and manages his own finances. *Id.* He testified that he cannot do dishes very well, however, because standing up for that long caused him back pain. *Id.* at 59.

The ALJ asked Burnham about the note by Dr. Sitenga-Kako that he had worked the night before the appointment filming a committee meeting, which suggested that he was standing when he held the camera. AR 59-60. Burnham testified that before his "problem started" he used to stand while holding the camera but that he now sits when he uses the camera. AR 60. He did not offer specific testimony as to whether he was standing or sitting on the night before his examination by Dr. Sitenga-Kako.

Next, the ALJ gave Burnham's attorney, Brian Barboza, an opportunity to ask questions.

*Id.* at 60. In response to questions from Barboza, Burnham testified that he previously was the primary cameraman at his current job until he became bedridden from illness. *Id.* at 60–61. Burnham testified that, about five or six years before, he had been bedridden for about a year straight because "pretty much every joint could barely move." *Id.* at 61. Burnham testified that he was wheelchair-bound for another six months. [5] *Id.* at 62. Burnham testified that when he returned to work he worked only on a limited basis because he was not able to do all the jobs he was doing before and was not able to put in as many hours. *Id.* Burnham testified that the only reason he has been able to continue working is because he is allowed to call in and not work when he needs to. *Id.* at 62–63. Burnham testified that because his schedule has already been reduced he needs to call out of work only about once a month but that before his schedule had been reduced he had to call out of work about once a week. *Id.* at 63. Burnham also testified that now he is "only assigned certain jobs" and that his assignments "have [t]o be preplan[ned]." *Id.* He testified that his assignments are also spaced out so that he can rest between them because if he does too many in a week his joints give him problems. AR 64. He reiterated his testimony that he is given "lots of time off" to rest. [6] *Id.*

The ALJ asked Burnham about the causes of his joint pain, noting that his gout appeared to be "more or less controlled in the record," and Burnham responded that it was partially arthritis. *Id.* at 64. The ALJ noted that no arthritis medication appeared to be listed in Burnham's record. *Id.* at 65. In response to questions from Barboza about his anxiety and sleep medications, Zoloft and Trazodone, Burnham testified that they gave him bouts of dizziness, forcing him to lie down for periods of about 15 minutes. *Id.* at 66. Barboza also asked Burnham about his ability to do housework. AR 67. Burnham testified that he has to break up his chores and do them "over the course of two days like ten minutes at a time over one day, then finish it the next day" because his

---

[5] Although the ALJ did not address the medical records that predate Burnham's alleged onset date, the Administrative Record includes medical records reflecting that Burnham was "bedbound" and using a wheelchair for at least six months in 2011 due to his gouty arthritis. *See, e.g.,* AR 395.
[6] Richard's uncle, who is also his work supervisor, submitted an employment questionnaire, dated August 8, 2016, in which he stated that "Richard's unpredictable physical limitations often lead[ ] to scheduling replacements or simply he is not assigned to several tasks [as] they would often not be possible for him to do or they may make his condition worse. Sitting and working is a small part of our productions." AR 356.

back and legs begin to hurt if he does housework for longer periods of time.  *Id.*

The ALJ noted that one of Burnham's doctors recommended thirty minutes of exercise a day, three to five times a week and asked Burnham if he had been able to implement this suggestion.  AR 68.  Burnham responded that it is a "constant struggle" and that he is "still working on it."  *Id.*  He testified further that his struggle with exercise was "one of the reasons [he] started seeing the therapist."  *Id.*

Next, the ALJ questioned VE Bonnie Drumwright, posing a series of hypotheticals.  *Id.* at 68.  The ALJ first presented the hypothetical scenario of someone of Burnham's age, education, and work experience, who was limited to medium work except for only frequent balancing, climbing of ramps or stairs, and no more than occasional crawling, climbing of ropes, ladders, or scaffolds, occasional exposure to high exposed places or moving mechanical parts, and no exposure to extreme cold.  *Id.* at 69–70.  In addition, this hypothetical claimant could understand, remember and carryout simple instructions and make simple work-related decisions, could tolerate occasional interaction with the public, and would require a moderate noise intensity level.  *Id.* at 70.  The VE testified that such a person could work as a janitor, a dishwasher, and a busser or dining room attendant and there are large numbers of such jobs in California and the United States as a whole.  *Id.*  The ALJ then altered the hypothetical to a scenario where the person was further limited to no exposure to high exposed places or moving mechanical parts, no ladders, ropes, or scaffolds, and could tolerate only occasional interaction with coworkers, instead of the public.  AR 70-71.  The VE responded that these additional limitations would eliminate the janitor position but that the busser and dishwasher positions would remain possible, as would the position of a day worker (house cleaner).  AR 72-73.  The ALJ's third hypothetical described an individual limited to light work, occasional balancing, stooping, and crouching, no kneeling, crawling, or climbing, no exposure to hazards, and no exposure to cold, heat, humidity, or atmospheric conditions such as smoke, fumes, odors, dust, gases, or poor ventilation.  *Id.* at 73.  This person could understand, remember, and carryout simple instructions and make simple work-related decisions, could tolerate occasional interaction with coworkers and the public and would be limited to a moderate noise intensity level.  AR 73-74.  The VE testified that such a claimant could work as a marker, a

8

small products assembler, and an office helper. AR 74. The VE testified that if the hypothetical

were altered to allow only sedentary work, such a person could work as an assembler of small

parts, document specialist, or table worker. AR 74-75.

The ALJ then questioned the VE about the impact of being "off task" on the jobs she had

listed. AR 75. The VE testified that if the hypothetical individual was off task 5% of the day, the

jobs discussed above would still exist, but if this were increased to 10% or more, the person would

probably lose these jobs during the first 90 days. AR 75–76. Moreover, the VE opined that the

individual could "probably" miss one day of work a month in these jobs, but that if he missed

more than that, these jobs would be eliminated. *Id.* at 76.

Barboza asked the VE whether a person in the third hypothetical (light work) would be

able to shift positions and sit down for fifteen minutes after every thirty minutes of standing, and

the VE testified that this qualification would eliminate the marker position and erode the

assembler and office helper job numbers by around half. AR 77-78. Asked by the ALJ whether

another job could replace the marker position in this scenario, the VE answered that a sub

assembler would be another option, but that the job numbers would also need to be decreased by

50%. AR 78-79. Finally, Barboza asked about a modification of the sedentary hypothetical that

the ALJ had posed, adding a requirement that the person could only sit for thirty minutes at a time

before needing to stand for fifteen minutes, and the VE testified that this would also erode the job

positions she had listed by half. AR 79. The VE opined that if this individual only had to stand

for a minute every thirty minutes all of the positions would remain but if he needed to lie down for

fifteen minutes every two hours all of the positions would be eliminated. *Id.* at 80.

### E. Regulatory Framework for Determining Disability

#### 1. Five-Step Evaluation Process

The Commissioner uses a "five-step sequential evaluation process" to determine if a

claimant is disabled. 20 C.F.R. § 404.1520(a)(4). At step one, the ALJ must determine if the

claimant is engaged in "substantial gainful activity." 20 C.F.R. § 404.1520(a)(4)(i). If so, the ALJ

determines that the claimant is not disabled and the evaluation process stops. If the claimant is not

engaged in substantial gainful activity, then the ALJ proceeds to step two.

At step two, the ALJ must determine if the claimant has a "severe" medically determinable impairment (or combination of impairments) that is expected to last for a continuous period of at least 12 months. 20 C.F.R. § 404.1520(a)(4)(ii); 20 C.F.R. § 404.1509. An impairment or combination of impairments is considered "severe" when it "significantly limits [a person's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c). If the claimant does not have a "severe" impairment or combination of impairments, then the ALJ will find that the claimant is not disabled. If the claimant has a severe impairment or combination of impairments, the ALJ proceeds to step three.

At step three, the ALJ compares the claimant's impairment with a listing of severe impairments ("Listing"). 20 C.F.R. § 404.1520(a)(4)(iii); *see also* 20 C.F.R. § 404, subpt. P, app. 1 (Listings). If the claimant's impairment is included in the Listing, then the claimant is disabled. 20 C.F.R. § 404.1520(a)(4)(iii). The ALJ will also find a claimant disabled if the claimant's impairment or combination of impairments equals the severity of a listed impairment. *Id.* If a claimant's impairment does not meet or equal a listed impairment, then the ALJ proceeds to step four.

At step four, the ALJ must assess the claimant's residual function capacity ("RFC"). 20 C.F.R. § 404.1520(a)(4)(iv). An RFC is "the most [a person] can still do despite [that person's] limitations" caused by that person's impairments and related symptoms. 20 C.F.R. § 404.1545(a)(1). The ALJ then determines whether, given the claimant's RFC, the claimant would be able to perform the claimant's past relevant work. 20 C.F.R. § 404.1520(a)(4)(iv). Past relevant work is "work that [a person] has done within the past fifteen years, that was substantial gainful activity, and that lasted long enough for [the person] to learn how to do it." 20 C.F.R. § 404.11560(b)(1). If the claimant is able to perform past relevant work, then the ALJ finds that the claimant is not disabled. If the claimant is unable to perform past relevant work, then the ALJ proceeds to step five.

At step five, the ALJ considers the claimant's residual functional capacity, age, education, and work experience to see if the claimant "can make an adjustment to other work." 20 C.F.R. § 404.1520(a)(4)(v). At this step, the burden shifts from the claimant to the Commissioner.

*Johnson v. Chater*, 101 F.3d 178, 180 (9th Cir. 1997). The Commissioner has the burden to "identify specific jobs existing in substantial numbers in the national economy that the claimant can perform despite her identified limitations." *Meanel v. Apfel*, 172 F.3d 1111, 1114 (9th Cir. 1999). If the Commissioner is able to identify such work, then the claimant is not disabled. If the Commissioner is unable to do so, then the claimant is disabled. 20 C.F.R. § 404.1520(g)(1).

### 2. Regulations Governing Time Periods Relevant to Burnham's Applications for DIB and SSI

To demonstrate eligibility for DIB, Burnham must establish that he was disabled between his alleged onset date and his date last insured, that is, between January 1, 2013 and March 30, 2013. 42 U.S.C. §§ 423(a) and (c); 20 C.F.R. § 404.131; *see also* AR 16 (ALJ's finding that Burnham was insured through March 30, 2013). SSI benefits, unlike DIB, are not payable for any period prior to the month after the application is filed. *See* 42 U.S.C. § 1382(c)(7); 20 C.F.R. §§ 416.335, 416.501. For the purposes of SSI, the relevant period for establishing disability is the date of Burnham's application to the date of the ALJ's decision, that is, May 13, 2014 to September 29, 2016. *See* 20 C.F.R. § 416.330.

### F. The ALJ's Decision

At step one, the ALJ determined that Burnham had not engaged in substantial gainful activity since January 1, 2013, the alleged onset date. *Id.* at 18. In particular, the ALJ found that Burnham had earned $2,248 in 2013, $1,036 in 2014, and did not have any earnings thereafter. *Id.*

At step two, the ALJ determined that Burnham had the following severe impairments: (1) gout; (2); arthritis; (3) morbid obesity; (4) spinal disorder; (5) osteopenia; (6) bilateral hearing loss; (7) depression; and (8) anxiety. *Id.* at 19. The ALJ found Burnham's hypertension, hyperlipidemia, migraines, hernia, and kidney stones to be non-severe impairments because these conditions had either been resolved, improved and stabilized, or had little effect on Burnham's overall functioning. *Id.* at 20. Additionally, the ALJ noted that allegations of chronic fatigue and pain were symptoms rather than independent impairments, that allegations of sciatica were "encapsulated by a discussion of spinal disorder," and allegations of dysthymic, obsessive-compulsive, and nightmare disorders were addressed "under a discussion of depression and

anxiety." *Id.*

At the step three, the ALJ concluded that Burnham's severe impairments did not meet or equal any listed impairments, specifically rejecting Listings 1.02, 1.04, 2.10, 12.04, and 12.06. *Id.* at 21–23.

At step four, the ALJ determined that Burnham had the residual functional capacity to:

> perform light work . . . with occasional balancing, stooping, and crouching. The claimant can never kneel or crawl, or climb ramps and stairs. The claimant can never climb ropes, ladders or scaffolds. The claimant can have no exposure to high, exposed places or moving mechanical parts. The claimant will have no exposure to extreme cold, heat or humidity; no exposure to hazards such as heights or moving machinery; or exposure to atmospheric conditions such as smoke, fumes, odors, dusts, gases or poor ventilation beyond a level typically found in an indoor work environment such as an office, retail store or laundromat. The claimant would require a moderate noise intensity level. The claimant can understand, remember and carry out simply instructions and make simple work[-]related decisions. The claimant can tolerate occasional interaction with coworkers and the public.

*Id.* at 22–23.

At step five, the ALJ found that there was no past relevant work that Burnham could perform at the "substantial gainful activity" level. Therefore, she went on to address whether "there are jobs that exist in significant numbers in the national economy that [Burnham] can perform." AR 28. The ALJ credited the VE's testimony that occupations such as a marker (with 271,000 jobs nationally), an assembler (with 16,000 jobs nationally), and an office helper (with 33,000 jobs nationally) were available for someone with Burnham's background and RFC. *Id.* With this finding, the ALJ concluded that Burnham was not disabled from January 2013 to the date of September 29, 2016, when the ALJ issued her decision, denying both the DIB and SSI applications. *Id.* at 28–29.

## G. Contentions of the Parties

Burnham argues that the ALJ erred at step four of the disability analysis, finding an RFC that does not accurately reflect Burnham's actual limitations, and that as a result she also erred at step five in finding him not disabled. In particular, he contends the ALJ erred by: (1) improperly rejecting the opinion of Dr. Akar, who was a treating physician, as to his physical limitations; (2)

failing to properly consider the effects that Burnham's obesity had on his other medical conditions, as required under Soc. Sec. Ruling ("SSR") 02-1p; (3) failing to properly assess Burnham's credibility with respect to his mental health impairments; and (4) improperly rejecting all of Burnham's GAF scores. The Commissioner argues that no legal errors were committed and that if there were any legal errors, they were harmless. The Commissioner further contends the denial of Burnham's applications was supported by substantial evidence.

## III.    ANALYSIS

### A.    Legal Standard

District courts have jurisdiction to review a final decision of the Commissioner and have the power to affirm, modify, or reverse the Commissioner's decision, with or without remanding for further hearing. 42 U.S.C. § 405(g); *see also* 42 U.S.C. § 1383(c)(3). When reviewing the Commissioner's decision, the Court takes as conclusive any findings of the Commissioner which are free from legal error and supported by "substantial evidence." 42 U.S.C. § 405(g). Substantial evidence is "such evidence as a reasonable mind might accept as adequate to support a conclusion," and it must be based on the record as a whole. *Richardson v. Perales*, 402 U.S. 389, 401 (1971). "'Substantial evidence' means more than a mere scintilla," *id.*, but "less than a preponderance." *Desrosiers v. Sec'y of Health & Human Servs.*, 846 F.2d 573, 576 (9th Cir. 1988) (citation omitted). Even if the Commissioner's findings are supported by substantial evidence, the decision should be set aside if proper legal standards were not applied when weighing the evidence. *Benitez v. Califano*, 573 F.2d 653, 655 (9th Cir. 1978) (quoting *Flake v. Gardner*, 399 F.2d 532, 540 (9th Cir. 1978)). In reviewing the record, the Court must consider "both the evidence that supports and the evidence that detracts from the Commissioner's conclusion." *Smolen v. Chater*, 80 F.3d 1273, 1279 (9th Cir. 1996) (citing *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985)).

Although the Court may "review only the reasons provided by the ALJ in the disability determination and may not affirm the ALJ on a ground upon which [the ALJ] did not rely," *see Garrison v. Colvin*, 759 F.3d 995, 1010 (2014), "harmless error analysis applies in the social security context." *Marsh v. Colvin*, 792 F.3d 1170, 1173 (9th Cir. 2015). Thus, where it is clear

that the ALJ's error caused no prejudice to the claimant, the Commissioner's decision should be affirmed. *See McLeod v. Astrue*, 640 F.3d 881, 888 (9th Cir. 2011). On the other hand, "where the circumstances of the case show a substantial likelihood of prejudice, remand is appropriate so that the agency can decide whether reconsideration is necessary." *Id.* Further, under "rare circumstances," remand for calculation and award of benefits, rather than for further proceedings, may be appropriate. *Garrison*, 759 F.3d at 1019-1021.

**B.     The ALJ Erred in Rejecting Dr. Akar's Opinion**

      **1.   Background**

In July 2016, Burnham was treated by Dr. Erin Akar at the Sonoma Valley Community Health Center, where Burnham received a significant portion of his health care. *See* AR 1034-1035, 1037-1057. Burnham was first seen by Dr. Akar on July 18, 2016, and her treatment notes from that visit are extensive, including a review of Burnham's family, medical, environmental and social history, a list of current medications and a description of Burnham's symptoms, as well as Dr. Akar's findings from her physical examination of Burnham. *See* AR 1037-1046. Dr. Akar described Burnham's "present illness" as hypertension, gout and depression. AR 1037. Her note reflects that the formal diagnosis for "gout" was "acute gouty arthropathy" and that the onset date for this diagnosis was October 3, 2012. AR 1039-1040. In her "assessment" she described it as "[c]hronic gout of multiple sites, unspecified cause." AR 1045. She described Burnham's symptoms as including "[b]ack pain, [j]oint pain [and] [j]oint tenderness." AR 1044. In addition, she observed that Burnham had the following psychiatric symptoms: "Anxiety, [d]ifficulty concentrating, [f]eeling down, depressed or hopeless (several days), [l]ittle interest or pleasure in doing things (several days), [r]acing thoughts." AR 1043. She noted that his weight was 296.5 pounds and that he had a BMI[7] of 46.26. AR 1044. Dr. Akar ordered a comprehensive metabolic panel, lipid profile and uric acid serum to be performed and refilled his prescriptions, continuing him on all of his medications at the same dose (allopurinol 300 mg. tablet, benazepril 20 mg.

---

[7] "[Body Mass Index ("BMI")] is the ratio of an individual's weight in kilograms to the square of his or her height in meters (kg/m2)." Titles II & XVI: Evaluation of Obesity, SSR 02-1P (S.S.A. Sept. 12, 2002).

tablet, colchicine-probene cid 0.5 mg.-500 mg tablet, metoprolol succinate ER 100 mg. tablet, trazadone 50 mg. tablet, Zoloft 50 mg. tablet).  AR 1045-1046.

On July 19, 2016 Dr. Akar had the clinic contact Burnham to inform him of his lab results and that because of "persistently elevated blood fat levels" he needed to take a statin medication, for which she had called in a prescription.  AR 1048.

On July 29, 2016, Burnham had another appointment with Dr. Akar.  AR 1034-1035, 1050, 1052-1057.  The notes from this visit list only "hyperlipidemia" as the "present illness" and states that that problem "has improved."  AR 1052.  However, gout and depression are still included in the list of Burnham's symptoms.  AR 1055-1056.  Dr. Akar's notes also reflect that a follow-up appointment was scheduled to occur in two months.

On July 29, 2016 Dr. Akar also completed a form entitled "Medical Opinion Re: Ability to Do Work-Related Activity (Physical)."  AR 1034.  In it, Dr. Akar listed the following limitations that she attributed to Burnhams "chronic gouty arthritis of multiple joints" and "BMI 46": maximum ability to lift and carry on an occasional basis less than ten pounds; maximum ability to lift and carry on a frequent basis less than ten pounds; maximum ability to stand and walk during an eight-hour day less than two hours; maximum ability to sit during an eight-hour day less than two hours; needs to alternate between sitting, standing and walking to relieve discomfort and can only sit 30 minutes before needing to change position or stand for 15 minutes before needing to change position and must walk around every 15 minutes and be allowed to alternate between sitting, standing at walking at will; needs to lie down at unpredictable intervals two to three times in an eight-hour day; can twist and stoop occasionally and can never crouch, climb ladders or stairs.  AR 1034-1035.  Dr. Akar also stated that Burnham cannot kneel, crawl or balance and found that Burnham had certain environmental limitations.  AR 1035. Finally, she found that Burnham was likely to miss more than four days a month of work due to his impairments.  *Id*.

The ALJ gave Dr. Akar's opinions "little weight" and declined to adopt many of the limitations listed on the work-related activity form Dr. Akar had completed for Burnham. AR 22, 26.  In particular, the ALJ included no limitations in Burnham's RFC regarding the time he could sit or stand or his need to alternate between sitting, standing and walking; nor did she include a

limitation related to his need to lie down two to three times a day. *See* AR 22. ALJ Kolikowski also did not accept Dr. Akar's opinion that Burnham would likely miss more than four days a month of work due to his impairments. The ALJ offered the following reasons for rejecting Dr. Akar's opinions:

> [Dr. Akar's] opinion is overly restrictive and is not supported by medical evidence. The medical record shows that the claimant only underwent conservative and intermittent treatment for his gout, and that medication was effective in managing this impairment. [AR 884, 974, 978, 1037]. Her opinion is also inconsistent with the minimal objective medical tests on file, all of which indicated normal to mild loss of functioning. [AR 898, 925, 986]. In addition, the claimant reported that he continued to work 35 hours a week. [AR 933]. This suggests that Dr. Akar based her opinion on subjective allegations rather than objective evidence, and therefore it receives little weight.

AR 26.

Burnham argues in his summary judgment motion that the reasons offered by the ALJ for giving little weight to Dr. Akar's opinions are insufficient under the standards that govern opinions of treating physicians. He further contends he was prejudiced by the error because the ALJ improperly failed to incorporate limitations into his RFC which would have precluded him from working in the occupations that were the basis for finding him not disabled at step five.

## 2. Legal Standards Governing Opinions of Treating Physicians

"Cases in this circuit distinguish among the opinions of three types of physicians: (1) those who treat the claimant (treating physicians); (2) those who examine but do not treat the claimant (examining physicians); and (3) those who neither examine nor treat the claimant (nonexamining physicians)." *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995), as amended (Apr. 9, 1996). "[T]he opinion of a treating physician is . . . entitled to greater weight than that of an examining physician, [and] the opinion of an examining physician is entitled to greater weight than that of a non-examining physician." *Garrison*, 759 F.3d at 1012. "'If a treating or examining doctor's opinion is contradicted by another doctor's opinion, an ALJ may only reject it by providing specific and legitimate reasons that are supported by substantial evidence.'" *Id.* (quoting *Lester*, 81 F.3d at 830). In *Garrison*, the Ninth Circuit explained that "[t]his is so because, even when contradicted, a treating or examining physician's opinion is still owed deference and will often be 'entitled to the greatest weight . . . even if it does not meet the test for controlling weight.'" *Id.*

(quoting *Orn v. Astrue*, 495 F.3d 625, 633 (9th Cir. 2007)).

An ALJ can satisfy the "substantial evidence" requirement by "setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings." *Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998). "The ALJ must do more than state conclusions. He must set forth his own interpretations and explain why they, rather than the doctor's, are correct." *Id.* (internal quotations and citation omitted).

### 3. Discussion

Because Dr. Akar is a treating physician and her opinions with respect to Burnham's physical limitations are contradicted by the opinions of CE Dr. Sitenga-Kako (who examined Burnham) and Dr. Hanna (who performed a record review but did not examine Burnham), the ALJ could reject Dr. Akar's opinions only if she provided specific and legitimate reasons that are supported by substantial evidence. The Court finds that she did not meet that standard.

The ALJ's first reason for assigning "little weight" to Dr. Akar's assessment was that the "overly restrictive" findings were "not supported by medical evidence." AR at 26. The Commissioner contends this is a specific and legitimate reason for giving Dr. Akar's opinions little weight because, among other things, the limitations found by Dr. Akar are inconsistent with her own treatment notes. Defendant's Motion for Summary Judgment at 6. The ALJ pointed to only one example of this, citing page 1037 of the Administrative Record in support of her conclusion that Burnham "only underwent conservative and intermittent treatment for his gout, and . . . medication was effective in managing this impairment." AR 26. This is a page from Dr. Akar's notes of Burnham's July 18, 2016 visit. Although Dr. Akar states on that page that Burnham's gout was "controlled on allopurinol," she also states in her notes of the same visit that Burnham's symptoms included "back pain, joint pain, [and] joint tenderness." AR 1044. There is nothing in Dr. Akar's notes that suggests that in using the word "controlled" Dr. Akar meant that Burnham did *not* suffer from these symptoms when on his prescribed medications. In fact, her notes clearly state the opposite.

The Court also rejects the Commissioner's reliance on Dr. Akar's statement in her notes of the July 29, 2016 visit that Burnham had "improved." *Id.* (citing AR 1052). This statement is

under the heading "hyperlipidemia" and clearly related to that condition rather than to the gout and BMI upon which Dr. Akar explicitly based her findings as to Burnham's limitations in the work-related activity form. AR 1052. The Court also notes that the ALJ did not cite to this statement in her decision and it is not clear that she relied on it. Even assuming she did, there is nothing in Dr. Akar's treatment notes that provides a legitimate reason for giving her opinions in the work-related activity form little weight.

Likewise, the ALJ's reliance on the medical record as a whole as a basis for rejecting Dr. Akar's opinions is not a specific and legitimate reason for rejecting Dr. Akar's opinions and is not supported by substantial evidence. First, the ALJ relied on the report of CE Dr. Sitenga-Kako in support of her conclusion that Burnham's treatment was "conservative" and his symptoms well-controlled by medication. That reliance was misplaced. AR 26 (citing AR 884). As a preliminary matter, the ALJ herself gives the opinions of Dr. Sitenga-Kako little weight, casting doubt on whether the opinions of that CE could ever constitute a legitimate basis for rejecting Dr. Akar's opinions. *See* AR 25 (stating that "the opinion of consultative examiner and internal medicine specialist Christina Kako, M.D., receives little weight" and finding that Sitenga-Kako "overestimates the claimant's level of functioning"). Even assuming they could, however, the Court finds that the report of this CE is not, in fact, a legitimate reason for rejecting Dr. Akar's opinions.

On the page cited by the ALJ, Dr. Sitenga-Kako provides a brief overview of Burnham's treatment history and implies that his gouty arthritis is not particularly serious because he is "not on any immunosuppressive medications [or] disease modifying rheumatic arthritic drugs." AR 884. To the extent that ALJ Krolikowski relied on the CE's description of Burnham's treatment history to conclude that Burnham's treatment was "intermittent" and "conservative" she had no rational basis for such reliance as Dr. Sitenga-Kako made clear that she was not provided with – and had not reviewed – any of Burnham's medical records. AR 884. Even more disturbing, Dr. Sitenga-Kako had no idea of Burnham's actual diagnosis and was under the impression that he was *not* diagnosed with gout. *See* AR 884 ("[h]e apparently was diagnosed two years ago at UCSF with some type of inflammatory arthritis versus gout."). Her misunderstanding concerning

18

Burnham's diagnosis may explain her suggestion that his impairment was not serious because he was not on certain arthritis medications, a conclusion that which ALJ Krowlikowski appears to have taken at face value even though it is not supported by any medical evidence in the record. *See* AR 24 (ALJ Krowlikowski pointing to the observation of Dr. Sitenga-Kako that "the claimant was not on any immunosuppressive medication for rheumatic or arthritic drugs, and that he had received very little recent treatment" in support of her conclusion that Burnham's physical impairments were not as severe as he claimed). In sum, it is clear that Dr. Sitenga-Koko did not have sufficient information to offer any reliable opinion about whether Burnham's treatment had been conservative or his gouty arthritis (a diagnosis of which she was unaware) was well-controlled and that the ALJ erred in relying on her opinions.

Next, the ALJ cites two notes from a March 30, 2015 visit to Dr. Carol Ahern, at the Sonoma Valley Community Health Center, that Burnham's condition had improved with respect to his gout. AR 974, 978. The notes from that visit, however, reflect that the "improvement" was relative to a period when Burnham was "bedridden due to widespread gout a few years ago." AR 974. The fact that Burnham had improved relative to a time when he had not been able to ambulate at all is not a specific and legitimate reason for concluding that he had improved to such a degree that he had no limitations on his ability to sit or stand for extended periods of time, or that he would not need to miss at least four days a month of work, as the ALJ's rejection of Dr. Akar's opinions suggests she concluded. Furthermore, in the same visit Dr. Ahern noted that Burnham continued to suffer "persistently" from lower back pain and that his symptoms are aggravated by sitting. AR 974.

ALJ Krowlikowski also cited AR 898, 925 and 986 as evidence of "objective medical tests" that supported her conclusion that Dr. Akar's opinions were entitled to little weight. This reason also falls short. Two of the tests were hearing tests. *See* AR 898, 925. Dr. Akar offered no opinions related to Burnham's hearing, however, and did not opine that he had any limitations based on his hearing. ALJ Krowlikowski offers no explanation for why she found these hearing tests relevant to Dr. Akar's opinions about Burnham's limitations related to sitting, standing and lying down, or her opinion about how many days a month he would need to miss work. The third

19

"test" cited by ALJ Krowlikowski was lab results related to Burnham's hyperlipidemia, a condition that the ALJ found to be non-severe and about which Dr. Akar had expressed no opinions. *See* AR 986. In other words, the test results that ALJ Krowlikowski relied upon have no relevance whatsoever to the opinions of Dr. Akar that the ALJ did not credit and do not provide a legitimate reason for rejecting Dr. Akar's opinions.

The Commissioner also argues that the ALJ sufficiently justified her decision to give Dr. Akar's opinions little weight based on Burnham's activities. Defendant's Motion for Summary Judgment at 6. In fact, the only activity the ALJ cited in connection with Dr. Akar's opinions was Burnham's work; in particular, the ALJ stated that Burnham "reported that he continued to work 35 hours a week," citing a treatment note by his therapist at Sonoma Valley Community Health Center, Mary Flett, reflecting that Burnham worked "3535" hours per week. *See* AR 933. The note was from a visit on April 8, 2015. AR 929. "Where the evidence is susceptible to more than one rational interpretation, one of which supports the ALJ's decision, the ALJ's conclusion must be upheld." *Thomas v. Barnhart*, 278 F.3d 947, 954 (9th Cir. 2002). Here, however, the ALJ's interpretation of the ambiguous treatment note was *not* rational and therefore is not entitled to deference.

ALJ Krowlikowski specifically found that Burnham "earned $2,2248 in 2013, $1,036 in 2014, and did not have any earnings thereafter." AR 18. As her decision was issued in late 2016 it clearly encompassed 2015. Furthermore, the exhibit the ALJ relied upon with respect to the amount of Burnham's yearly earnings included 2015 and reflects Burnham's earnings in that year as "0". AR 249. All the other evidence in the record also supports the conclusion that during the period of time at issue Burnham worked no more than ten hours a week. Burnham's testimony at the 2016 hearing was that he worked very limited hours – only two to three times a week for between a half hour and three or four hours. AR 49. Another CE, Dr. Marinos, reported in 2014 that Burnham worked 5-10 hours a week. AR 879. Similarly, a therapist who met with Burnham on August 1, 2016 reported that he worked ten hours a week. AR 1063. Indeed, aside from the April 8, 2015 treatment note, there is *no* evidence in the record that Burnham had worked more than ten hours a week at any time after his alleged onset date. Nor does ALJ Krowlikowski offer

any explanation for interpreting the notation "3535" to mean 35 when that interpretation conflicted with all of the other evidence in the record and even her own findings with respect to his earnings. In short, ALJ Krowlikowski's s reliance on a single notation that was an obvious typographical error to conclude that Burnham was working more than three times as many hours a week than is reflected in all the other evidence in the record was unreasonable and illegitimate and does not support her decision to give Dr. Akar's opinions little weight.

The Commissioner also points to evidence that Burnham sometimes exercises to show that the ALJ's decision to give little weight to Dr. Akar's opinions was legitimate and supported by substantial evidence. Defendant's Motion for Summary Judgment at 6. The Commissioner cites a January 31, 2013 treatment note from UCSF stating that Burnham walked one mile a day seven days a week, *see* AR 911-912, and a series of later treatment notes reflecting a "sedentary" activity level, with Burnham getting 0 to five hours of exercise each week and exercising only two to three times a week. The Commissioner does not explain why the small amount of exercise reflected in these records, which does not appear to be inconsistent with Dr. Akar's findings, justifies rejecting Dr. Akar's opinions with respect to Burnham's functional limitations. Therefore, to the extent the ALJ relied on Burnham's exercise, this is not a legitimate reason to reject Dr. Akar's opinions.

With respect to Burnham's other activities, the Court notes that ALJ Krowlikowski appeared to place significant weight on the observation of CE Dr. Sitenga-Kako that Burnham had reported working the night before the examination filming a meeting, despite her statement elsewhere in the decision that she placed "little weight" on Sitenga-Kako's opinions. AR 24. In particular, the ALJ stated that Burnham "reported [to Sitenga-Kako] that he had worked standing and holding a camera for *a few hours* the night before the examination." *Id.* (emphasis added). Yet Dr. Sitenga-Kako had stated that Burnham typically worked only "a couple" of hours at a time and there is no evidence in the record that Burnham worked longer than that on the night before his examination with the CE. AR 884. Nor is there any evidence in the record as to whether Burnham was able to take breaks periodically or alternate between sitting and standing that night. As evidence that Burnham worked "a couple of hours" is consistent with Dr. Akar's opinion that

he could not stand or sit for more than two hours at a time, the ALJ's reliance on this activity (which she mischaracterized with respect to its length) does not provide a legitimate basis for rejecting Dr. Akar's opinions as to Burnham's limitations.

For these reasons the Court finds that the ALJ erred in disregarding Dr. Akar's opinion because the reasons offered were neither "specific and legitimate" nor supported by substantial evidence. *See Ryan*, 528 F.3d at 1198. The Court also finds that this error prejudiced Burnham because the ALJ omitted from his RFC limitations that would have precluded Burnham from the work that the ALJ found he could perform at Step Five.

### C. The ALJ Erred in Failing to Properly Assess Burnham's Obesity

#### 1. Background

Burnham's medical records consistently reflect that his BMI has been in the "extreme obesity" range during the relevant time period.[8] *See* AR 808 (BMI 46.39, October 3, 2012), 817 (BMI 46.83, November 1, 2012), 831 (BMI 44.79, August 26, 2013), 836 (46.64, March 25, 2014), 854 (BMI 45.61, July 9, 2014), 898 (BMI 45.99 February 6, 2015), 978 (BMI  46.46, March 30, 2015), 989 (BMI 46.69, April 28, 2015), 1021 ((BMI 46.12, December 28, 2015), 1044 (BMI 46.26, July 18, 2016), 1056 (BMI 46.34, July 29, 2016).  As discussed above, Dr. Akar specifically referenced Burnham's obesity as one of the reasons for the limitations she found.  In addition, a number of other health care providers expressly linked Burnham's obesity to his other impairments.  AR 820 (notes from November 7, 2012 visit to Sonoma Valley Community Health Center, noting in connection with obesity that Burnham has "multiple health issues including gout"), 913 (notes from January 31, 2013 UCSF visit state that Burnham "may have gout unrelated to congenital enzyme deficiency and related to diet, obesity, genetic predisposition etc."), 904-905 (notes from February 11, 2015 visit to Sonoma Valley Community Health Center stating that Burnham was experiencing back and joint pain and that Burnham needed "weight

---

[8] "The Clinical Guidelines recognize three levels of obesity. Level I includes BMIs of 30.0-34.9. Level II includes BMIs of 35.0-39.9. Level III, termed 'extreme' obesity and representing the greatest risk for developing obesity-related impairments, includes BMIs greater than or equal to 40. These levels describe the extent of obesity, but they do not correlate with any specific degree of functional loss."  Titles II & XVI: Evaluation of Obesity, SSR 02-1P (S.S.A. Sept. 12, 2002).

United States District Court
Northern District of California

reduction"), 986-990 (notes from April 28, 2015 visit to Sonoma Valley Community Health Center, observing that Burnham was experiencing persistent pain in mid and lower back, that pain is aggravated by sitting, standing, and walking, and recommending weight loss to address lower back pain). Finally, in addition to the joint pain and tenderness discussed above, the medical record includes numerous observations that Burnham was suffering from lower back pain and fatigue. *See, e.g.*, AR 835 (fatigue), 854 (fatigue), 884 (back pain), 904 (back pain and fatigue), 949 (fatigue), 1037 (fatigue), 1055 (back pain).

In her decision, ALJ Krolikowski found that Burnham's "morbid obesity" was a severe impairment at step 3. AR 19. She did not, however, address the impact of his obesity (if any) on his RFC. Similarly, the ALJ did not address Burnham's "allegations of chronic fatigue and pain," stating only that these were "symptoms rather than independent impairments" and providing no further discussion of how they might affect Burnham's RFC. AR 20.

In response to Burnham's arguments that the ALJ erred by failing to consider the impact of his obesity on his limitations, the Commissioner argues that the ALJ satisfied her obligation by recognizing obesity as one of Burnham's impairment at step three. Defendant's Summary Judgment Motion at 3. The Commissioner further asserts that even if the ALJ did not expressly address Burnham's obesity, there was no error because 1) the record does not reflect that Burnham has any limitations associated with his obesity; and 2) the ALJ considered the opinions of CEs who were aware of Burnham's obesity.

### 2. Discussion

While obesity alone is not a qualifying disability under the Listings at step three, it remains classified as a "determinable impairment that can be the basis for a finding of disability" where it results in functional limitations that preclude the claimant from working. *See* 64 FR 46122. SSR 02-01 offers the following guidance with respect to the ALJ's consideration of obesity in determining a claimant's RFC:

> An assessment should also be made of the effect obesity has upon the individual's ability to perform routine movement and necessary physical activity within the work environment. Individuals with obesity may have problems with the ability to sustain a function over time. As explained in SSR 96-8p ("Titles II and XVI: Assessing Residual Functional Capacity in Initial Claims"), our RFC

> assessments must consider an individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis. A "regular and continuing basis" means 8 hours a day, for 5 days a week, or an equivalent work schedule. In cases involving obesity, fatigue may affect the individual's physical and mental ability to sustain work activity. . . .
>
> The combined effects of obesity with other impairments may be greater than might be expected without obesity. For example, someone with obesity and arthritis affecting a weight-bearing joint may have more pain and limitation than might be expected from the arthritis alone. . . .

SSR 02-1p (footnote omitted). Where a claimant is obese, the ALJ has a special duty to "fully and fairly develop the record and to assure that the claimant's interests are considered." *Celaya v. Halter*, 332 F.3d 1177, 1183 (9th Cir. 2003) (holding that ALJ erred in failing to consider claimant's obesity in assessing her ability to work); *see also Jaroch v. Barnhart*, 2004 WL 1125050 (N.D. Cal.) (same).

Here, the medical record is replete with evidence that Burnham's obesity was linked to chronic pain and fatigue, and that his obesity, in combination with his chronic gout, resulted in specific functional limitations. As discussed above, Dr. Akar opined that Burnham's obesity (in combination with his gouty arthritis) limited the length of time he could sit or stand, required that he lie down and rest several times in a day, and would result in at least four days a month of missed work. The ALJ did not include *any* of these limitations in Burnham's RFC, however. Nor did she address his allegations of chronic pain and fatigue, which she dismissed on the basis that they were merely "symptoms." The ALJ erred in failing to address the effect of Burnham's obesity on his RFC.

The Court also rejects the Commissioner's argument that ALJ Krowlikowski did not err because she relied on the opinions of CEs Sitenga-Kako, Hanna and Amon, who were aware of Burnham's obesity yet found that he could do medium work. As discussed above, the ALJ herself found that Dr. Sitenga-Kako's opinions were entitled to little weight because she underestimated Burnham's functional limitations. Dr. Hanna did not examine Burnham and while she acknowledges Burnham's obesity she does not expressly address its impact on his functional limitations. AR 92-93. Further, it is apparent that Dr. Hanna simply relied on the opinion of Dr. Sitenga-Kako for her RFC. AR 93. The Commissioner's reliance on Dr. Amon's opinion is also

24

misplaced as Dr. Amon, like Dr. Hanna, did not examine Burnham and relied on the opinions of Dr. Sitenga-Kako as to his functional limitations. AR 125-126. Certainly, neither of these CEs offered any explanation of their conclusions relating to Burnham's functional limitations or addressed why they did not find that Burnham's obesity resulted in the functional limitations listed by Dr. Akar. Consequently, reliance on the opinions of the CEs does not satisfy the ALJ's obligation to consider the medical evidence of functional limitations caused by Burnham's obesity. In any event, the ALJ did not, in fact, rely on the opinions of the CEs cited by the Commissioner in support of her RFC, stating in her decision that Burnham's RFC was based on the opinions of only two of the CEs – Drs. Friedland and Marinos. AR 27.

The ALJ erred in failing to address the impact of Burnham's obesity on his RFC and by failing to provide reasons for disregarding the opinion of Burnham's treating physician with respect to the functional limitations associated with his obesity. The Court also finds that this error prejudiced Burnham because the ALJ omitted from his RFC limitations that would have precluded Burnham from the work that the ALJ found he could perform at step five.

**D.    The ALJ Erred in Assessing Burnham's Mental Health Limitations**

**1.  Background**

The record reflects that Burnham has struggled with depression and anxiety since he was an adolescent and has received treatment for those impairments, at least intermittently. *See, e.g.,* AR 342, 541, 581, 582, 583, 584, 585, 678, 687, 756, 880. Medical records from the first quarter of 2013 (the period that is relevant to Burnham's DIB application) do not reflect that he sought treatment for his depression and anxiety during that period. In 2014, however, CE Marinos conducted a mental status examination and found that Burnham was "mildly anxious" and noted that he "complained of depressed mood, with sleep problems, 'stress eating,' (with weight gain, occasional crying episodes, problems with concentration, and feelings of hopelessness and worthlessness." AR 880. She assigned him a GAF of 60 and concluded that Burnham could "understand and carry out simple job instructions, but may have mild/moderate difficulty interacting effectively with others and moderate difficulty maintaining concentration over the course of a normal work day and coping with stress in job setting." AR 881. Some of Burnham's

medical providers also observed in 2014 that Burnham was anxious and/or depressed. *See* AR 845 (note from 5/20/14 office visit that Burnham was experiencing anxiety), 851 (note from 7/9/2014 that Burnham "detail[ed] depression but refuse[d] [Behavioral Health] referral"), AR 854 (note from same visit observing "[a]nxiety, [f]eeling down, depressed or hopeless").

On February 6, 2015, Burnham completed a depression screening at Sonoma Valley Community Health Center, obtaining a score that reflected "severe depression." AR 892-897. Burnham was referred to therapist Mary Flett, who he began seeing for psychotherapy on April 8, 2015. AR 929-936. In her notes of the April 8, 2015 visit, Flett noted that Burnham said his attorney told him to be seen at the clinic as part of his disability evaluation. AR 931. She stated that his "[p]rimary issue" was "acute anxiety experienced at high levels on a daily basis," and that he had a "lifetime history of depression and anxiety and low cognitive functioning." *Id.* Among other things, Flett noted that Burnham needed "prompting" with respect to activities of daily living, had "[p]oor motivation and adherence" with respect to his medications, that medication management was a "current need area," that he could not "prioritize or implement time management," and experienced "constant worries and feelings of being overwhelmed." AR 934-945. She assigned a GAF of 35 and recommended that Burnham seek treatment in an intensive outpatient day treatment program where he could receive "skills training and behavioral management" in a "long-term setting." AR 931, 935.

Burnham's next appointment with therapist Mary Flett was on April 20, 2015, when Flett observed "minimal progress." AR 937. She noted a "[c]ontinued lack of motivation and inability to follow through." *Id.* She also stated that Burnham had "not been able to sleep [the night before the appointment] because he was anxious about the appointment" and that she "[r]einforced [the] positive behavior of showing up and then staying through the whole session." AR 938. Flett again listed his GAF as 35. AR 939.

On May 11, 2015 Burnham had another appointment with Flett. AR 941-943. Flett observed that Burnham had seen a psychiatrist and was "now taking Zoloft with good effect."[9]

---

[9] The Court has found no records of any visits with a psychiatrist during this period but presumes this is because the record is incomplete and not that Burnham did not see one given that Flett

AR 941. She noted that Burnham's mood was "engaging" and that "tics were present for most of [the] session, but without [the] frequency and intensity of previous sessions." AR 941. Flett noted that Burnham still had difficulty with activities of daily living and the primary goal of treatment continued to be to significantly reduce anxiety, but the focus of treatment was expanded to address sleep hygiene and "OCD-like" symptoms. AR 942. Flett noted that Burnham's GAF was 50 at this visit. AR 943.

The next visit with Flett reflected in the administrative record was on June 29, 2015. AR 945-948. At this visit Flett noted "some progress," with an "improved mood," but she also noted that Burnham's mood continued to be "dysthymic most of the day, every day" and that he continued to have "anxious thoughts," though he "tolerated them better." AR 945-946. Burnham reported an "expanding social network" but that he "[r]emain[ed] fatigued after social interactions." AR 946. Burnham's GAF remained at 50. AR 947.

Burnham saw Flett again for a follow-up on August 26, 2015. AR 949-952. She wrote that Burnham "present[ed] with anxious/fearful thoughts, compulsive thoughts, depressed mood, difficulty concentrating, diminished interest or pleasure, excessive worry, fatigue and feelings of guilt." AR 949. Flett wrote that Burnham arrived late for his appointment, noting that he "needed to overcome his anxious distress just to make the appointment." AR 950. Flett observed that Burnham's mood was "depressed" and characterized by despondency, despair, and/or moroseness or 'empty mood.'" *Id*. She noted that his depression was "regularly worse in the morning" and that he was waking up at least two hours before his usual time. A GAF of 50 continued to be reflected on the treatment notes for this visit. AR 951.

Burnham's next appointment with Flett was on November 11, 2015.[10] In her notes of this visit, Flett wrote that Burnham "returns after four months." AR 954. In fact, the medical records of Burnham's appointments with Flett reflect that this was inaccurate as Burnham had seen her on August 26, 2015, that is, two and a half months before. Flett observed that Burnham's symptoms had worsened and that he was experiencing "anxious/fearful thoughts, depressed mood, difficulty

_____

makes clear that the prescription for Zoloft came from a psychiatrist.

concentrating, difficulty falling asleep, difficulty staying asleep, diminished interest or pleasure, excessive worry, fatigue, feelings of guilt, increased libido and poor judgment." AR 953. She further noted that Burnham's depression was "aggravated by conflict or stress, lack of sleep and traumatic memories" and that his depression was "associated with chronic pain." *Id*. Flett noted that since his last appointment with her Burnham had "decompensated" and that his isolation was "extreme." AR 954. She observed an "inability to engage with others." *Id*. She also observed a "[d]ramatic increase in intensity of depression and anxious distress." *Id*. Flett revised his GAF to 35. AR 955.

Burnham saw Flett again on November 16, 2015, when his mood had improved, though he continued to present with "anxious/fearful thoughts, excessive worry and feelings of guilt." AR 957-958. Flett revised his GAF to 45. AR 959. Flett assigned the same GAF at his next appointment, on November 23, 2015. AR 963. At his appointment the following week, on November 30, 2015 Flett found some improvement, moving his GAF to 50, and opined that Burnham had "stabilized." AR 965-967.

On December 14, 2015, Flett observed only "minimal progress" and noted that Burnham presented with "anxious/fearful thoughts, compulsive thoughts and excessive worry." AR 969. She noted that Burnham reported "increased socialization, but continue[d] to experience debilitating social anxiety in almost all situations." AR 970.[11]

There are no further records of appointments with Flett and notes from an intake visit on August 1, 2016 reflect that Burnham was last seen by Flett in January 2016. AR 1061. At the hearing, Burnham testified that Flett had left the clinic and he was trying to find a new therapist. AR 55. He also testified at the hearing that he was seeing a psychologist. *Id*. The notes from the August 1, 2016 intake visit reflect that Burnham was referred to Neurological Associates for a psychological assessment and a new therapist, and to a psychiatrist named Dr. Mall for medication management, however there are no records from those providers in the administrative record. AR 1062.

---

[11] No GAF was listed for this visit and it appears that the last page of the report is missing from the record.

In addressing Burnham's mental impairments, ALJ Krolikowski found that Burnham's "medically determinable impairments could reasonably be expected to cause the alleged symptoms" but concluded that the medical records did not support "the alleged severity of [Burnham's] depression and anxiety." AR 24. The ALJ offered the following reasons for her conclusions:

> He testified that he has difficulties in crowds. However, mental status examinations from August 2013 through July 2016 indicate that the claimant maintained normal cognitive functioning. Medical providers consistently noted that the claimant was oriented, with normal insight, judgment, and an appropriate mood and affect (Exhibit 5F/26, 31, 40; 10F/52; 12F/9). Moreover, in April 2015, the claimant reported that he continued to work 35 hours a week and wanted to work as much as he was able for his uncle (Exhibit 10F/7). In addition, the claimant's symptoms improved with treatment. For example, the claimant began treatment at Sonoma Valley Community Health Center in April 2015. In May 2015, he was already demonstrating positive effects from medication, as his mood was engaging and tics had decreased (Exhibit 10F/15). Medical providers observed that the claimant's mood was brighter and more positive, further remarking that his thought processes, motor activity, and behavior had notable positive changes (Exhibit 10F/16). In June 2015, the claimant reported that he had expanded his social network, indicating that he was overcoming his social difficulties (Exhibit 10F/20). Although his symptoms worsened in November 2015, this was due to a 4-month cessation in treatment (Exhibit 10F/28). After restarting treatment, his symptoms improved significantly (Exhibit 10F/32), and by December 2015, he again reported increased socialization.
>
> The claimant's testimony regarding to [sic] gaps in treatment is inconsistent with treatment records, particularly in light of the positive benefits that treatment has provided. The claimant testified that he did not continue to pursue mental health treatment because he is not good with scheduling doctor's appointments. This is not consistent with his ability to schedule medical appointments for his physical impairments, which was also at Sonoma Valley Community Health Center. In addition, the claimant appears to have pursued mental health treatment for reasons other than to resolve impairments. April 2015 treatment notes show that the claimant's attorney had told him to be seen at the clinic as part of his disability evaluation (Exhibit 10F/5). In August 2016, when the claimant again began a counseling program at Sonoma Valley Health Center, he again requested a disability evaluation after a referral by his lawyer (Exhibit 12F/27).

AR 25-26.

The ALJ went on to find that the opinion of CE Dr. Marinos was entitled to "great weight" with respect to Burnham's mental impairments during the period relevant to Burnham's DIB application (January 1, 2013 to March 30, 2013) but gave her opinion only partial weight as to the

SSI application based on medical records showing that Burnham became more diligent in seeking treatment in 2015 and suggesting that at that point Burnham had "greater limitations in social functioning." AR 25. The ALJ gave little weight to the GAF scores on the basis that "GAF scores only represent a brief snapshot of the claimant's functioning and are not representative of his functioning over an extended period." AR 26. The ALJ gave "partial weight" to the opinion of H. Barrons, Psy.D, noting that she performed only a record review. AR 26, 90. Finally, the ALJ gave significant weight to the opinions of CE Myles Friedland regarding Burnham's mental impairments. AR 27. The ALJ concluded that the functional limitations found by this CE – that Burnham "could sustain concentration for simple one and two-step mental tasks, could maintain the social demands of a work-like setting involving limited contact with co-workers and the general public, and could adapt to changes in a work-like setting involving simple mental tasks and limited social contact only" – were consistent with Burnham's "recent mental health treatment that shows more restricted social functioning." *Id*.

In his summary judgment motion, Burnham contends the ALJ erred by not crediting his allegations of more severe functional limitations than were included in his RFC, including his inability to maintain a routine work schedule, inability to work in close proximity with co-workers or the public, inability to follow multi-level instructions, inability to deal with the stress of a work environment, inability to stay on task and inability to maintain attention and concentration. Plaintiff's Summary Judgment Motion at 15-16. Burnham contends the ALJ cherry-picked isolated statements in the record, or even misrepresented notes in the record, to suggest that his functional limitations are less severe than the medical record actually shows, and that she disregarded evidence that supported the conclusion that he was more severely impaired than is reflected in his RFC. He also argues that the reasons offered by the ALJ for discounting his allegations were not "specific, clear and convincing" as is required where there is objective medical evidence of an underlying impairment and there is no finding that the claimant is malingering. *Id*. at 21 (citing *Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009)). Finally, he contends it was improper for the ALJ to dismiss out of hand all of his GAF scores. *Id*. at 22-25.

The Commissioner contends the ALJ's RFC with respect to Burnham's mental

30

impairments is supported by substantial evidence and that she properly found that his impairments were not as severe as he alleged based on the opinions of the CEs who addressed Burnham's mental limitations. Defendant's Motion for Summary Judgment at 7. The Commissioner further asserts that the ALJ was entitled to disregard the GAF scores. *Id*. at 8-9.

### 2. Discussion

"[T]he ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and for resolving ambiguities." *Reddick v. Chater*, 157 F.3d 715, 722 (9th Cir. 1998) *Reddick*, 157 F.3d at 722 (9th Cir. 1998). "The ALJ's findings, however, must be supported by specific, cogent reasons." *Id.* "In evaluating the credibility of a claimant's testimony regarding subjective [symptoms], an ALJ must engage in a two-step analysis." *Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009) (citation omitted); *see also Molina v. Astrue*, 674 F.3d 1104, 1112 (9th Cir. 2012). "First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged." *Ligenfelter v. Astrue*, 504 F.3d 1028, 1036 (9th Cir. 2007) (internal quotation marks and citation omitted); *see also Molina*, 674 F.3d at 1112. "Second, if the claimant meets this first test, and there is no evidence of malingering, the ALJ can reject the claimant's testimony about the severity of her symptoms only by offering specific, clear and convincing reasons for doing so." *Ligenfelter*, 504 F.3d at 1036 (internal quotation marks and citation omitted). "General findings are insufficient; rather, the ALJ must identify what testimony is not credible and what evidence undermines the claimant's complaints." *Berry v. Astrue*, 622 F.3d 1228, 1234 (9th Cir. 2010) (quoting *Lester*, 81 F.3d at 834); *Treichler v. Comm'r of Soc. Sec. Admin.*, 775 F.3d 1090, 1103 (9th Cir. 2014) ("Although the ALJ's analysis need not be extensive, the ALJ must provide some reasoning in order for us to meaningfully determine whether the ALJ's conclusions were supported by substantial evidence.").

Here, the ALJ found that Burnham's "medically determinable impairments could reasonably be expected to cause the alleged symptoms," and did not find that Burnham was malingering. AR at 23. The ALJ was therefore required to "offer[] specific, clear and convincing reasons" to reject Burnham's testimony regarding the severity of his mental impairments. ALJ

1    Krolikowski did not meet this standard.

2        The ALJ's first stated reason for rejecting the "alleged severity of [Burnham's] depression

3    and anxiety" was that "mental status examinations from August 2013 through July 2016 indicate

4    that [Burnham] maintained normal cognitive functioning" and that "providers consistently noted

5    that the claimant was oriented, with normal insight, judgment, and an appropriate mood and

6    affect."  While the ALJ cited a handful of such notations by providers, she could only have

7    concluded that Burnham's providers *consistently* made such findings by ignoring large swaths of

8    Burnham's medical records (many of which are summarized above), especially with respect to the

9    time period beginning in early 2015, when Burnham's medical records reflect that his anxiety and

10   depression had become more severe (as the ALJ herself acknowledged).  The medical records of

11   Burnham's therapist, for example, are replete with notes reflecting that Burnham's mood and

12   affect were far from normal.

13       Further, ALJ Krolikowski mischaracterizes the observations of some of the doctors in

14   stating that they found that Burnham had normal cognitive function, normal insight and judgment

15   and appropriate mood and affect.  For example, the ALJ cited to a note by Dr. Ahern from a visit

16   on March 30, 2015 in support of her statement based on a single notation that Burnham had

17   "appropriate mood and affect."  AR 978.  Yet the record of that visit also states that Burnham was

18   "positive" for anxiety and depression, listed "depressive disorder" in his "Problem List" and noted

19   that Burnham was going to be scheduling an appointment with Behavioral Health.  AR 974-978.

20   Indeed, as discussed above, Burnham's mental health screening only a week later, and the notes of

21   his visits with Flett during that period, showed that he was suffering from severe depression and

22   acute anxiety at that time, as discussed above.

23       The ALJ's reliance on a treatment note from a visit with Dr. Akar on July 18, 2016 is even

24   more misplaced.  *See* AR 1044.  A psychiatric note at AR 1044 (cited by the ALJ) seems to

25   suggest that Dr. Akar found that Burnham had no psychological impairment, indicating that the

26   exam was "normal" as to "psychiatric" issues and that Burnham was negative for a long list of

27   symptoms, including anxiety, and had normal judgment and normal attention span and

28   concentration.  *Id*.  Yet Dr. Akar's notes from that visit, when read as a whole, present a very

different picture. In summarizing Burnham's "present illness" in her notes of the same visit, Dr. Akar stated that Burnham "presents with anxious/fearful thoughts, depressed mood, difficulty concentrating, diminished interest or pleasure, racing thoughts and restlessness . . . ." AR 1037. In the Review of Symptoms at AR 1043 (again, from the same visit) the note states that Burnham was "positive" for "[a]nxiety, [d]ifficulty concentrating, [f]eeling down, depressed or hopeless (several days), [l]ittle interest or pleasure in doing things (several days) [and] [r]acing thoughts." AR 1044. And finally, just above the notation that the ALJ apparently relied upon, there is a separate entry for "psychiatric issues" with the comment "Anhedonia, Inappropriate mood and affect – depressed. Behavior is inappropriate for age. Forgetful. Hopelessness. Inappropriate affect – depressed." AR 1044. The ALJ apparently ignored all of these statement by Dr. Akar, and offered no explanation for her decision to credit the single inconsistent statement in Dr. Akar's notes rather than all of the other observations from the same appointment.

In sum, the ALJ's assertion that the record consistently showed that Burnham had normal cognitive function, normal insight and judgment and appropriate mood and affect is entirely inaccurate and is not a clear and convincing reason for finding that Burnham's limitations are not as severe as he alleges.

ALJ Krowlikowski also rejected Burnham's allegations regarding the severity of his mental impairments based on her erroneous finding that Burnham had "reported that he continued to work 35 hours a week and wanted to work as much as he was able for his uncle." AR 24. The ALJ relied on the same typographical error discussed above, reflecting that Burnham worked "3535" hours a week. AR 933. As discussed above, there was no rational basis for ALJ Krowlikowski's interpretation of this note as evidence that Burnham worked 35 hours a week and her reliance upon this evidence in support of that finding is entitled to no deference. Moreover, her statement that Burnham "wanted to work as much as he was able" misrepresents the actual statement in the medical record upon which she relied, which states in full: "Works as much as he can for his Uncle, *but is limited both physically and emotionally*." *See id.* (emphasis added). This sort of "cherry-picking" the record is improper.

Next, the ALJ found that Burnham's mental health impairments were not as severe as he

33

alleged because they "improved with treatment," pointing to notes from some of Burnham's sessions with therapist Mary Flett in 2015 that his symptoms had improved. As discussed above, however, the medical records show that Burnham's symptoms of depression and anxiety both improved and worsened, waxing and waning, between the time of his alleged onset date and the date of the ALJ's decision. Even when receiving regular treatment for his depression and anxiety, Burnham's symptoms were better in some weeks and worse in others, as the notes from his sessions with Flett reflect.

The Ninth Circuit has cautioned that when evaluating mental health impairments, "it is error to reject a claimant's testimony merely because symptoms wax and wane in the course of treatment." *Garrison v. Colvin*, 759 F.3d 995, 1017 (9th Cir. 2014). The court in *Garrison* explained:

> Cycles of improvement and debilitating symptoms are a common occurrence, and in such circumstances it is error for an ALJ to pick out a few isolated instances of improvement over a period of months or years and to treat them as a basis for concluding a claimant is capable of working. Reports of "improvement" in the context of mental health issues must be interpreted with an understanding of the patient's overall well-being and the nature of her symptoms. They must also be interpreted with an awareness that improved functioning while being treated and while limiting environmental stressors does not always mean that a claimant can function effectively in a workplace.

*Id.* The ALJ in this case relied on isolated statements regarding "improvement" without considering them in the broader context of Burnham's mental health conditions and overall well-being. And once again, ALJ Krowlikowski mischaracterized the record, stating that Burnham "reported increased socialization" in December, AR at 25, but omitting the second half of the sentence upon which she was apparently relying. *See* AR at 970 ("[Burnham] reports increased socialization, *but continues to experience debilitating social anxiety in almost all situations*.") (emphasis added).[12]

_____

[12] The GAF scores that were regularly updated during Burnham's treatment with Flett, in 2015, also reflect these ups and downs. "Although GAF scores, standing alone, do not control determinations of whether a person's mental impairments rise to the level of a disability (or interact with physical impairments to create a disability), they may be a useful measurement." *See Garrison*, 759 F.3d at 1002 n.4. In this case, the GAF scores mirrored Flett's specific observations about Burnham's mental impairments and offer an overview of Burnham's progress

The ALJ also appears to have concluded that she could disregard the marked worsening of Burnham's impairments observed by Flett in the November 11, 2015 treatment notes, AR 953-955, on the basis of her finding that this worsening was due to a "4-month" gap in treatment.  AR 25.  The suggestion seems to be that Burnham's impairments, hypothetically, would not have been as severe as they actually were if he had sought treatment sooner and therefore, that his deterioration could be ignored.  Yet the ALJ's task is not to evaluate the symptoms of some hypothetical claimant but rather, to determine the *actual* severity of the claimant's impairments. Moreover, the record reflects that the ALJ was incorrect in finding that there had been a four-month gap in treatment.  Rather, treatment notes show that the gap at issue was two and a half months, as discussed above.

More broadly, the Court finds that the ALJ's discussion of the significance of gaps in Burnham's mental health treatment does not support her conclusions regarding the severity of Burnham's mental impairments.  A claimant's "unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment" may provide a clear and convincing reason for an ALJ to reject a claimant's allegations about the severity of his symptoms. *Smolen v. Chater*, 80 F.3d 1273, 1284 (9th Cir. 1996).  For example, in *Chaudhry v. Astrue*, cited by the Commissioner in her summary judgment motion, evidence of failure to seek treatment for depression was found to be an adequate basis for the ALJ to conclude that the claimant was exaggerating his symptoms of depression. 688 F.3d 661, 672 (9th Cir. 2012).  However, such a conclusion is not supported in the record of this case because, as the ALJ herself found, the record

_____

and/or deterioration over time. As the ALJ considered Burnham's alleged improvement to be a significant basis for rejecting his testimony as to his mental limitations, the overview offered by the GAF scores was probative of that question and the ALJ had an obligation to address them. *See Vincent on Behalf of Vincent v. Heckler*, 739 F.2d 1393, 1395 (9th Cir. 1984) (the ALJ "must explain why 'significant probative evidence has been rejected.'") (quoting *Cotter v. Harris*, 642 F.2d 700, 706 (3d Cir. 1981)).  The ALJ ignored all of Burnham's GAF scores on the basis that each presented only a "brief snapshot" of Burnham's functioning and that they were "not representative of his functioning over an extended period."  AR 26.  Yet these GAF scores, like Flett's notes, were medical opinions that, when considered together, were relevant to Burnham's overall mental condition over time, placing in perspective the ALJ's selective references to "improvements" in Flett's notes.  Therefore, the ALJ erred in refusing to consider the GAF scores or to explain why, when taken together, they were consistent with his RFC.

shows that Burnham's mental health treatment – far from being unnecessary – has provided Burnham with "positive benefits." AR 25. In other words, it would be illogical on this record to conclude that Burnham's gaps in treatment were because he did not *need* treatment and indeed, the ALJ reached the opposite conclusion, finding that his condition deteriorated during gaps in treatment.

The ALJ also seems to suggest that Burnham exaggerated his symptoms because she did not find credible his testimony that he has difficulty scheduling appointments for mental health treatment, pointing to the fact that he schedules medical appointments for himself. AR 25. In reaching this conclusion, ALJ ignored the evidence in the record that Burnham's therapist (a treating physician who conducted numerous therapy sessions with Burnham) attributed his difficulty making and keeping appointments for therapy as a *symptom* of his mental impairments and especially, his anxiety. *See* AR 938 (noting that Burnham "had not been able to sleep last night because he was anxious about his appointment"); AR 950 (Burnham "needed to overcome his anxious distress just to make his appointment"). The ALJ did not point to any evidence in the record that supports her conclusion to the contrary, which is not supported by substantial evidence. *Regennitter v. Comm'r of Soc. Sec. Admin.*, 166 F.3d 1294, 1299–1300 (9th Cir. 1999) ("[I]t is a questionable practice to chastise one with a mental impairment for the exercise of poor judgment in seeking rehabilitation.").

Similarly, the ALJ does not explain why it is relevant to her analysis that Burnham reported that he was told to seek mental health treatment by his lawyer on two occasions. *See* AR 931, 1062. While a lawyer's recommendation that a claimant see a medical provider *might* be evidence that a claimant was exaggerating their symptoms if there was no evidence that the claimant actually required treatment, that is not the case here. The first treatment note that mentioned that Burnham's attorney told him to seek treatment was Mary Flett's note from Burnham's April 8, 2015 visit, when she found Burnham to be suffering from depression and anxiety so severe that she recommended that Burnham enroll in an intensive outpatient day program. AR 931. The second such notation was in an intake note dated August 1, 2016, just two weeks after Dr. Akar had observed during an office visit that Burnham was "anxious/fearful" and

"depressed." AR 1037. Construing a mere mention in a claimant's medical records of an application for disability benefits -- or of a lawyer's advice that a claimant seek treatment for the impairment -- as evidence that the individual is exaggerating their symptoms or seeking unnecessary treatment is unreasonable and such evidence, by itself, does not constitute substantial evidence that can support an ALJ's credibility finding with respect to the severity of a claimant's subjective complaints.

Finally, the Court rejects the Commissioner's argument that conflicting opinion evidence from consultative examiners Friedland, Marinos and Barrons provided the ALJ with a valid reason to discount Burnham's testimony. "Contradiction with the medical record is a sufficient basis for rejecting the claimant's subjective testimony." *Carmickle v. Comm'r, Soc. Sec. Admin.*, 533 F.3d 1155, 1161 (9th Cir. 2008). To reject a claimant's subjective complaints, however, the ALJ "must specifically identify what testimony is credible and what testimony undermines the claimant's complaints." *Morgan v. Comm'r of Soc. Sec. Admin.*, 169 F.3d 595, 599 (9th Cir. 1999). While the ALJ cited the opinions of the CEs with respect to Burnham's mental limitations, she did not address Burnham's testimony about specific limitations that she omitted from his RFC, such as his inability to maintain a normal work schedule. Nor did she explain why the opinions of the CE's justified rejecting that testimony. The Court notes that the two CEs upon which the ALJ placed the greatest weight, Marinos and Friedland, did not discuss this issue in their opinions, which were offered before Burnham's began treatment with therapist Flett and without the benefit of those medical records. *See* AR 879-881 (Marinos), 124 (Friedland).

The Court further finds that the ALJ failed to offer adequate reasons (or even address in any meaningful way) Burnham's testimony that he experiences debilitating stress in a work setting, not only due to social interactions but also in connection with the tasks themselves. The Social Security Administration has emphasized the importance of conducting a thorough and individualized analysis of the ability of individuals with mental impairments to function in the face of work-place stress, offering the following guidance:

> Individuals with mental disorders often adopt a highly restricted and/or inflexible lifestyle within which they appear to function well. Good mental health services and care may enable chronic patients to

function adequately in the community by lowering psychological pressures, by medication, and by support from services such as outpatient facilities, day-care programs, social work programs and similar assistance.

The reaction to the demands of work (stress) is highly individualized, and mental illness is characterized by adverse responses to seemingly trivial circumstances. The mentally impaired may cease to function effectively when facing such demands as getting to work regularly, having their performance supervised, and remaining in the workplace for a full day. . . . Thus, the mentally impaired may have difficulty meeting the requirements of even so-called "low-stress" jobs.

Because response to the demands of work is highly individualized, the skill level of a position is not necessarily related to the difficulty an individual will have in meeting the demands of the job. A claimant's condition may make performance of an unskilled job as difficult as an objectively more demanding job. For example, a busboy need only clear dishes from tables. But an individual with a severe mental disorder may find unmanageable the demands of making sure that he removes all the dishes, does not drop them, and gets the table cleared promptly for the waiter or waitress. Similarly, an individual who cannot tolerate being supervised may not be able to work even in the absence of close supervision; the knowledge that one's work is being judged and evaluated, even when the supervision is remote or indirect, can be intolerable for some mentally impaired persons. Any impairment-related limitations created by an individual's response to demands of work, however, must be reflected in the RFC assessment.

Titles II & XVI: Capability to Do Other Work-The Medical-Vocational Rules As A Framework for Evaluating Solely Nonexertional Impairments, SSR 85-15 (1985). The ALJ appears to have concluded, based on the opinions of the CEs, that limitations in Burnham's RFC relating to contact with the public and performance of simple tasks adequately addressed the functional limitations associated with Burnham's work-related stress. She does not explain, however, why these limitations were sufficient in the face of Burnham's testimony, and notes in the medical record reflecting that he experienced high levels of stress and had difficulty functioning even in a job that appears to have involved simple tasks and limited contact with the public.[13] Burnham also

---

[13] The Court notes that at step three, the ALJ rejected Burnham's allegation that he would be limited with respect to concentration, persistence and pace because of workplace stress, pointing to Burnham's testimony that he could "concentrate sufficiently to play video games for 4 to 5 hours a day, and during his consultative examination, he was able to spell 'world' forwards and backward, repeat five digits forward and four digits backward, and perform simple mental calculations." AR 22. Based on this evidence, the ALJ found only "moderate" limitations with respect to concentration, persistence and pace. *Id.* Yet the ALJ offers no explanation for her apparent assumption that playing video games alone in his room is in any way comparable to a

testified that he could only work limited hours because he had to recover, sometimes for days, from his short work shifts. The ALJ did not conduct a thorough or individualized analysis of the impact of work stress on Burnham's RFC and improperly discounted his testimony on the limitations associated with work stress without adequate reasons or substantial evidence.

For the reasons stated above, the ALJ erred in discrediting Burnham's subjective testimony about the severity of his mental health symptoms. The Court further concludes that the error was not harmless because Burnham's testimony that the ALJ failed to credit reflected that he had limitations that were not included in his RFC.

### E.    Remedy

Once a district court has determined that an ALJ has erred, the court must decide whether to remand for further proceedings or to remand for immediate award of benefits. *Harman v. Apfel*, 211 F.3d 1172, 1177–78 (9th Cir. 2000). Under this Circuit's "credit as true" rule, a court must credit as true evidence that was rejected and remand for an immediate award of benefits if "(1) the ALJ has failed to provide legally sufficient reasons for rejecting such evidence, (2) there are no outstanding issues that must be resolved before a determination of disability can be made, and (3) it is clear from the record that the ALJ would be required to find the claimant disabled were such evidence credited." *Id.* at 1178 (quoting *Smolen v. Chater*, 80 F.3d 1273, 1292 (9th Cir. 1996)). On the other hand, a court should remand for further proceedings when "the record as a whole creates serious doubt as to whether the claimant is, in fact, disabled within the meaning of the Social Security Act," *Garrison*, 759 F.3d at 1021, or where "there is a need to resolve conflicts and ambiguities," *Treichler v. Comm'r of Soc. Sec. Admin.*, 775 F.3d 1090, 1101 (9th Cir. 2014).

The Court has found that the ALJ failed to provide legally sufficient reasons for rejecting medical evidence related to Burnham's physical impairments and for rejecting Burnham's allegations relating to the severity of his mental impairments. The Court further finds that under the credit-as-true rule, the testimony of Dr. Akar establishes that Burnham was disabled based on

---

work setting. Nor do the simple tasks he was able to perform shed any significant light on his ability maintain concentration, persistence and pace. Indeed, it is hard to imagine that spelling "world" backwards or repeating four or five digits could take more than a minute or two. The ALJ's evaluation of the impact of workplace stress at step three, as at step four, was insufficient.

the functional limitations associated with his obesity and gouty arthritis. In particular, Dr. Akar found that Burnham would need to take breaks to lie down, at unpredictable times, two to three times in an eight-hour day. AR 1034. She also found that Burnham would miss more than four work days a month due to his impairments. AR 1034. In light of the VE's testimony that the need to take frequent unscheduled breaks to lie down or to miss more than two days of work a month would rule out all the jobs listed by the ALJ at step five, *see* AR 76, 80, Dr. Akar's testimony, which the Court credits as true, establishes that Burnham was disabled at step five.

The Court also notes that although the relevant time periods for DIB and SSI are not identical, the ALJ clearly concluded that it was appropriate to use a single RFC for both applications based on the entire medical record, implicitly finding that there were only minor changes in Burnham's impairments between the alleged onset date and the date of the ALJ's decision that did not affect his RFC. Likewise, the Court's review of the medical records supports the ALJ's conclusion – at least with respect to Burnham's physical impairments -- that his condition remained stable over the entire time period. Therefore, it is not necessary to remand for determination of an alleged onset date with respect to his SSI application.[14]

## IV.    CONCLUSION

For the reasons stated above, the Court GRANTS Plaintiff's Motion for Summary Judgment, DENIES the Commissioner's Motion for Summary Judgment and reverses the decision of the Commissioner. The Court remands to the Social Security Administration for award and calculation of benefits (both DIB and SSI).

**IT IS SO ORDERED.**

Dated: March 25, 2019

_____
JOSEPH C. SPERO
Chief Magistrate Judge

---

[14] Because the Court concludes that Burnham is entitled to benefits based on his physical limitations it need not address whether further proceedings might have been necessary with respect to his mental impairments had he not been eligible for benefits on the basis of his physical limitations.